ETNA COAL & IRON CO. v. MARTING IRON & STEEL CO.

(Circuit Court of Appeals, Sixth Circuit. January 14, 1904.)

No. 1,160.

1. MORTGAGES—PROVISIONS—POWER OF SALE—APPRAISEMENT—VALIDITY.

Provisions of a corporate mortgage or deed of trust that, in case of default, the instrument might be foreclosed without resort to judicial proceedings, and that the trustees, after advertisement, should themselves sell the property without appraisement, and convey to the purchasers by deed all the mortgagor's right and title to the premises, and that a sale so made shall be a perpetual bar at law or in equity against the mortgagor and all persons claiming or to claim the premises or any part thereof, etc., were valid.

2. SAME—DEFEASANCE CLAUSE—EFFECT.

A provision of a corporate mortgage authorizing a sale by trustees without appraisement was not affected by a defeasance clause that, if

the mortgagor should make all the payments provided for, and comply with the covenants of the mortgage, it should be void.

**3.** SAME—STATE STATUTES—EFFECT.

Ohio Rev. St. 1892, §§ 5316, 5389, 5390, 5391, 5398a; 5404, providing for the foreclosure of mortgages and the sale of real estate under execution, do not forbid a provision in a mortgage authorizing foreclosure by sale under a power, without appraisement.

**4.** SAME—TRUSTEES—AUTHORITY TO SELL.

Where a corporate mortgage gave trustees the right to sell the property and foreclose the mortgage on default on the written request of the holders of one-fourth in amount of the outstanding bonds secured by the mortgage, or without such request, in their own discretion, the trustees were authorized to foreclose the mortgage by sale after default for the payment of bonds held by them and secured by the mortgage without the written request of any party in interest.

**5.** SAME—SALE—TIME.

Where a sale of property under a corporate mortgage was advertised to be held at a particular hour and the weight of the evidence showed that the sale was cried substantially at the hour advertised, and no objection was made at the time by any of complainants' representatives because of delay, the sale was not invalidated by reason of the fact that there was some delay in consequence of efforts made by complainants' officers and stockholders to enjoin the sale.

**6.** SAME—VALIDITY OF SALE—BIDDING BY TRUSTEES.

Where bondholders secured by a corporate mortgage authorized the trustees to bid for the property the full amount of the debt, with interest, taxes, and costs owing to such bondholders, such bidding by the trustees, which enhanced the value of the property and encouraged competition, did not invalidate the sale.

**7.** SAME—PURCHASE BY TRUSTEES.

A provision in a corporate mortgage to trustees authorizing them to purchase the property at a foreclosure sale thereof for the benefit of bondholders was valid, and authorized the trustees individually to purchase the property at their own sale under the mortgage for the benefit of bondholders.

**8.** SAME—COLLUSION.

In a suit to set aside a sale of property on foreclosure of a corporate mortgage to trustees to secure bonds, evidence *held* insufficient to show collusion between the seller of the property to the mortgagor and the trustees for the purpose of forcing a foreclosure.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

This is a bill to set aside a sale of certain furnace property, made by trustees under a mortgage, as having been made without authority of law and in fraud of the rights of the complainant as mortgagor. The facts, so far as deemed essential to be stated at this point, are as follows: The property involved consists of two iron furnaces and some 26 acres of land in Ironton, Lawrence county, Ohio. This property, together with a body of about 13,000 acres of coal and ore land in the same county, was, prior to 1895, the property of the Ironton Coal & Iron Company, a corporation of West Virginia, but not a party to this suit. In September, 1895, the complainant company, the Etna Coal & Iron Company, was organized under the laws of West Virginia, and became the purchaser of the furnaces and 26 acres of land mentioned from the said Ironton Coal & Iron Company. The price to be paid was $100,000, payable in installments evidenced by obligations called bonds and secured by a first mortgage upon the premises, executed to Joseph S. Clark and Julien Henry Lee. To further secure the deferred purchase money the said purchasers covenanted to immediately expend in improvements and repairs not less than $30,000, and, to protect this covenant, bound themselves to deposit in a named bank the sum of $10,000 to the credit of the vendor, to

be forfeited in default of compliance with this agreement. At the date of this purchase the entire property of the Ironton Coal & Iron Company was under a mortgage to secure an issue of bonds aggregating $150,000. The trustees under this mortgage were Joseph S. Clark and Edwin G. McInnes. These trustees joined in the execution of the conveyance by the said Ironton Coal & Iron Company to the said Etna Coal & Iron Company for the purpose of releasing the lien of their mortgage upon the premises conveyed, having agreed to accept the purchase-money bonds of the Etna Company as a substitute for the property thus released, all of which was authorized by the mortgage and requested by the Ironton Company. The Ironton Company's deed was absolute, reciting that it was upon a consideration of $100,000, secured "by a mortgage or deed of trust dated and delivered simultaneously." Simultaneously with the delivery of the deed, the Etna Coal & Iron Company made and delivered its mortgage upon the said premises to J. H. Lee and J. S. Clark, as trustees, to secure an issue of $100,000 in bonds, with interest coupons payable semiannually. This mortgage contained the usual clauses providing for the precipitation of the maturity of the principal upon a default in payment of interest for six months "after notice in writing," etc. It was also provided that upon default in payment of the principal as it should become payable the trustees should, upon "written request of the holders of one-fourth in amount of the bonds secured hereby, and then outstanding, or upon their own discretion, and without such request, sell and dispose of all or any part of the premises, fixtures, and other property hereby mortgaged and conveyed, or intended so to be, by the Etna Coal & Iron Company, at public auction in such place or places within the state of Ohio as the trustees may designate, and at such time or times as the trustees may appoint, having first given notice of the time or times and place or places of such sale or sales by advertisement not less than once a week for eight weeks in a newspaper," etc., "and to adjourn such sale or sales from time to time at their discretion," etc., "and to make and deliver to the purchaser thereof good and sufficient deeds in the law for the conveyance of all the right and title of the iron company to the premises or any part thereof so sold; and before making any such sale or sales the trustees shall not be required to have the property to be sold appraised or valued in accordance with any present or future law of the state of Ohio, or any other state, the Etna Coal & Iron Company hereby waiving the benefit of all such laws now existing or hereafter passed; which sale or sales, made as aforesaid, shall be a perpetual bar, both at law and in equity, against the Etna Coal & Iron Company, and all persons lawfully claiming or to claim the said premises or any part thereof by, from, through, or under it; and after deductng from the proceeds of such sale or sales, just allowances for all expenses of sale, including attorney's and counsel fees and all other expenses, advances, or liabilities which may have been made or incurred by the trustees in the trust and all payments which may have been made by them for taxes or assessments and for charges and liens on the said premises or any part thereof, prior to the lien of these presents, as well as reasonable compensation for their own services, to apply the said proceeds to the payment of the principal of the said bonds and the interest due thereon, if said income and proceeds be sufficient, but, if not, then pro rata without giving preference, priority, or distinction to one bond over another, or as between principal or interest; and if there shall remain any surplus after payment of all the said bonds hereby secured or intended so to be in full, both principal and interest, then to pay over and account for such surplus to the Etna Coal and Iron Company." Default having been made in the payment of interest, the trustees, in pursuance of the powers of the mortgage, did expose and publicly sell the premises on September 25, 1897. J. H. Lee and Joseph S. Clark, being the trustees making the sale, were the highest and best bidders at said sale, and the property was accordingly bid in by them at the price of $80,000. Subsequently Lee and Clark, as trustees, executed a conveyance to Lee and Clark as individuals in pursuance of their powers under the said mortgage. Under date of October 12, 1897, Lee and Clark, as individuals and as trustees under the said mortgage, joined Edwin G. McInnes and Joseph S. Clark as trustees under the mortgage of the Ironton Coal & Iron Company to them, in the execution of a quitclaim deed of the

premises involved to the said Ironton Coal & Iron Company. This deed, among other things, recited that Lee and Clark, in bidding in the said property at their sale as trustees, were acting for Edwin G. McInnes and Joseph S. Clark, trustees under the mortgage of the Ironton Company, and as the beneficial mortgagees under the mortgage of the Etna Company, being holders of the bonds secured by said mortgage. Having become again invested with the title to the premises, the said Ironton Company made a supplemental mortgage to the said Lee and McInnes as trustees to secure their bonded indebtedness of $150,000 heretofore mentioned. Being thus restored to its ownership of the premises involved, the Ironton Company, under date of December 19, 1898, again sold and conveyed the said furnace and property to Henry A. Marting for the consideration of $90,000, partly in cash and partly in notes secured by mortgage. McInnes and Clark, as trustees under the mortgage of the Ironton Company, joined in this conveyance for the purpose of releasing the lien of the mortgage as to the premises, having agreed to accept the obligations of the said Marting in room and place of the security so released. Subsequently, the Marting Iron & Steel Company was organized under the laws of Ohio, and the property so purchased by Marting was conveyed to it. Upon a final hearing the court below held that the foreclosure sale of the premises under the mortgage made by the complainant company was valid and effective, and that complainant had not made any case entitling it to have said sale set aside for fraud or irregularity.

The bill was accordingly dismissed.

Hector M. Hitchings, for appellant.
A. R. Johnson and S. H. Tolles, for appellee.

Before LURTON and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. The case must chiefly turn upon the validity of the power of sale contained in the mortgage made by the Etna Coal & Iron Company to Clark and Lee, as trustees, to secure the purchase-money notes made by the mortgagor company. Whether we call that instrument a mortgage, or a mortgage in the nature of a deed of trust, is of no vital importance. The parties to the instrument have undertaken to provide that, in case of default in the payments secured, there need not be a resort to judicial proceedings, but that the trustees should, after advertising as provided, themselves sell the property and convey to the purchasers by deed "all the right and title of the iron company to the premises," and that a sale so made "shall be a perpetual bar, both at law and in equity, against the Etna Coal & Iron Company and all persons claiming or to claim the said premises or any part thereof," etc. They further undertook to provide that "the trustees shall not be required to have the property to be sold appraised or valued in accordance with any present or future law of the state of Ohio or any other state." But it is said that this instrument contains a clause providing that, if the makers should well and truly make all the payments as provided, and do all other things required by the covenants of the obligation, it should become "null and void and of no effect," and that the effect of this defeasance clause is to nullify the agreement for a sale without appraisement by the trustees, and to require a proceeding in equity notwithstanding the agreement of the parties. We know of no principle of the

common law which deprives the owners of property of the right to confer upon a trustee the power to sell the mortgaged premises upon default in the payment of a debt secured thereby. Neither is there any difference in principle between a power of sale conferred in the mortgage itself or by a separate power of attorney. In either case, if the power is executed according to its terms, the title to the premises, though granted only by way of security, will pass to the purchasers upon due execution of a conveyance by the trustee. The authorities are all one way upon this question, and, unless there be some law of Ohio to the contrary, which this court is obligated to follow, the title, right, and interest of the appellant passed to the purchaser at the trustee's sale if that sale was fairly made in pursuance of the power of sale contained in the mortgage. 3 Wash. Real Prop. (6th Ed.) pp. 1003, 1005, 1015, 1019; 3 Jones on Mortgages, § 1764; Elliott ,v. Wood, 45 N. Y. 71; Bell Silver Mining Co. v. National Bank of Butte, 156 U. S. 470, 477, 15 Sup. Ct. 440, 39 L. Ed. 497; Koch v. Briggs, 14 Cal. 256, 73 Am. Dec. 651; Grant v. Burr, 54 Cal. 298. In Bell Mining Co. v. National Bank, cited above, the question arose under a Montana mortgage, and a statute of that territory was supposed to forbid sales under a power in a mortgage. After construing the statute as not intended to have any such effect, the court, after quoting from a California case in respect of a like statute, said:

"We agree to what is stated by the court in that case. There is nothing in the law of mortgages, nor in the law that covers what are sometimes designated as trust deeds in the nature of mortgages, which prevents the conferring by the grantor or mortgagor in such instrument of the power to sell the premises described therein upon default in payment of the debt secured by it, and, if the sale is conducted in accordance with the terms of the power, the title to the premises granted by way of security passes to the purchaser upon its consummation by a conveyance. Grant v. Burr, 54 Cal. 298; Bateman v. Burr, 57 Cal. 480. The power of sale in the indenture, whether we call it a deed of trust or a mortgage, does not change its character as an instrument for the security of the indebtedness designated, but it is an additional authority to the grantee or mortgagee, and, if he does not choose to foreclose the mortgage by any of the ordinary methods provided by law, he can proceed under the power added for the sale of the property, to obtain payment of the indebtedness. The insertion of a power of sale does not affect the mortgagor's right to redeem so long as the power remains unexecuted, and the mortgage is not, as it may be, foreclosed in the ordinary manner; but when a sale is made of the interest of the mortgagor his right is wholly divested, embracing his equity redemption. Mr. Jones, in his careful treatise on Mortgages, observes that 'the delay and expense incident to a foreclosure and sale in equity have brought power of sale mortgages and trust deeds into general favor both in England and America, and, although their general use is now confined to a part only of our states, the same influences which have already led to their partial adoption and use are likely to lead to their general use everywhere at an early day. * * * A power of sale, whether vested in the creditor himself or in a trustee, affords a prompt and effectual security.' "

But the complainants say that, whatever be the common law, under the law of Ohio this mortgage could not be enforced without an appraisement and a judicial decree. In Martin v. Alter, 42 Ohio St. 94, 98, it was held that a conveyance of land for the purpose of securing a debt is "a mortgage, or mortgage in the nature of

a deed of trust," when it contains a condition providing that the conveyance shall be void and of no effect if the debt is paid as stipulated, and that under such an instrument the title remains in the mortgagor, subject to the right of the creditor to enforce the condition of the mortgage, and that until the title has been divested by a sale it is subject to be levied upon "subject to the mortgage." On the other hand, the court said: "If there is no such condition, but the conveyance is an absolute deed of trust for the purpose of raising money to pay a debt as agreed, the grantor parts with all of his legal title, and whatever rights he has are, in their nature, equitable merely." The case did not involve the validity of a power of sale, the only question being whether a lien subordinate to the mortgage had been acquired by the levy of an execution upon the mortgagor's title before sale. To the same effect is National Bank v. Tenn. Coal & Iron Co., 62 Ohio St. 564, 57 N. E. 450.

Conceding for the purposes of this case, that the legal title remained in the complainant, and that it was such a title as was subject to levy subject to the mortgage, does it follow that the power of sale conferred by the mortgage was ineffective, and that the title still remains in the mortgagor, notwithstanding the sale authorized by the instrument has been made? Whether we call this instrument a mortgage or a deed of trust, and whether the title passed at once to the trustees or not, is of no vital importance, for the character of the instrument is not changed thereby. It is, in either event, a security for the indebtedness secured, and for the more expeditious and economical enforcement of the security the parties have provided for a sale by the trustees upon default, and that upon such sale and the execution and delivery of a deed that the title of the mortgagor shall pass to the purchaser. This power is but an additional element of protection to the creditor, and there is nothing in the Ohio decisions referred to which affects in any way the validity of such a power. Indeed, the opinion of the court deals with this very question, and while what was said in reference to the power of sale was not essential to the decision of the points involved, it is not out of place to refer to it as indicative of the opinion of Judge Burket as to the law of Ohio upon the matter now under discussion. Upon this subject Judge Burket said:

"The power of sale, instead of showing the instrument to be a deed passing title to the grantee, has the contrary effect, and aids in showing the instrument to be a mortgage, as no such power is necessary in a deed which passes title, because the deed, by its own vigor, carries with it the power of sale to the grantee, while a mortgage does not carry such power unless expressly granted therein. The power of sale in this instrument is in the nature of a power of attorney to sell and convey lands, in which case the legal title remains in the grantor until the power is executed. The only purpose to be served or advantage to be gained by a power of sale in a trust deed or mortgage is to enable the trustee to take possession of the property and sell it under the power, and thereby cut off the vested rights of the grantor without the aid or delay of a proceeding in court. The grantee may, however, refuse to exercise the power of sale, and invoke the aid of a court to make the sale as upon foreclosure; and where subsequent liens have attached such a course becomes necessary, because a sale by the trustees would convey a title burdened with such subsequent liens. Until a sale shall be made, either under the power or by the order of court, the grantor will retain his vested rights

in the property, and such rights will be subject to liens the same as his other lands and tenements."

Complainants cite Babcock v. Camp, 12 Ohio St. 11, 34, where Judge Brinkerhoff, in the course of his opinion, said:

"This trust deed, it will be observed, was in the nature of a mortgage given as a security for money loaned, and by its terms conferred on the lender and grantee a power of sale without appraisement on default being made in the repayment of the loan. And if, in order to decide this case, it were necessary for us to pass definitely upon the question of the validity of a sale made in pursuance of the terms of such an instrument, it would become a subject of serious, and perhaps doubtful, inquiry, whether, in view of the long-established policy of our laws forbidding the sale of lands pledged by way of mortgage for less than two-thirds of their appraised value, such a sale could be upheld. But, in our view of the case, it is not necessary to pass upon that question—and we avoid the expression of any opinion upon it—because, whether the sale under the deed of trust were valid or invalid, we are of opinion that the only parties interested in questioning the validity of that sale, to wit, the plaintiffs, and Graham & Belden and Moreau & Scudder, are concluded by the proceedings and decree in the King suit, and are not now at liberty to call the validity of that sale in question."

But this is confessedly pure dictum, and as such not authoritative.

We are utterly unable to discover any statutory provisions which in any way forbid the granting of a power of sale by a mortgagor or require an appraisement contrary to the agreement of the parties. Sections 5316, 5389–5391, 5398a, 5404, Rev. St. Ohio 1892, are supposed to have some bearing upon the subject, but we quite agree with the trial judge, who held that there was nothing in these provisions which prohibits the exercise of the right incident to ownership of conferring authority upon the mortgagee or trustee to sell, either by a separate instrument or by a power in the mortgage itself. The dictum of Judge Brinkerhoff in Babcock v. Camp, cited above, is not in accord with the Ohio cases, for sales under such powers have been frequently upheld. Johnson v. Turner, 7 Ohio, 216, pt. 2; Turner v. Johnson, 10 Ohio, 205; Brisbane v. Stoughton, 17 Ohio, 482; Woodruff v. Robb, 19 Ohio, 212. That the instruments containing such power were deeds of trust, rather than mortgages, may be true, but neither the Ohio court nor any other has ever held that a power of sale under one form of security would be good and under the other bad. If there is nothing in the Ohio statutes which forbids such a power of sale in a security under which the title passes to the trustee, there is likewise nothing which forbids such a power in a like security when the technical legal title remains in the mortgagor.

2. But it is objected that, if the power of sale in the mortgage be valid, the sale should be set aside for certain irregularities which are said to have occurred. First, it is said that the trustees were not authorized to make any sale under the mortgage because they had not been requested so to do by any party in interest. But such request was not essential. The mortgage gave the trustees the right to make such sale upon default "upon the written request of the holders of one-fourth in amount of said bonds then outstanding, * * * or without such request or security or indemnity in their own discretion." In addition, it may be added that the bonds se-

cured by the said mortgage were delivered to Clark and McInnes, trustees, under a mortgage made by the Ironton Coal & Iron Company to secure an issue of bonds aggregating $150,000. That mortgage included the furnace and lands subsequently sold and conveyed by the Ironton Company to the complainant company. Clark and McInnes released their lien upon the property so sold by virtue of a power in the mortgage to them, upon condition that they should receive and hold the purchase-money bonds to be issued by the complainant company as a substitute for the security so released. Clark and McInnes, as trustees holding the complainants' bonds, did request Lee and Clark, trustees under the complainants' mortgage securing said bonds, to enforce said mortgage by a sale. Clark and McInnes were the "holders" of such bonds within the meaning and purpose of the mortgage, and had such title as made it their duty to enforce their payment.

3. It is next urged that the sale was advertised to take place at 10 o'clock, and that in fact it did not occur for some hours thereafter. There was some delay in the sale in consequence of an effort made by one of complainants' officers and stockholders to enjoin the sale upon the ground that such a sale was unauthorized without an appraisement, and there is a great conflict in the evidence as to the extent of the delay thus occasioned. We have made a careful examination of the testimony, and we are of opinion that complainants' case upon this point is not made out. The weight of proof is that the sale was cried substantially at the hour advertised, and that there was no such delay as some of the witnesses think there was. No objection to proceeding with the sale was then made on that account by any of the representatives of complainant present at the time.

4. It is said that there was some collusive arrangement between Clark and Lee as trustees and one Hart, an officer of the Ironton Coal & Iron Company, in regard to the bidding at the sale. McInnes and Clark, trustees holding the bonds secured by the mortgage so to be enforced, had directed Lee and Clark to bid at the sale for them, as holders of the bonds so secured, and had authorized them to bid their full debt and interest and taxes, costs, etc., but to buy at a less price if able, and to act upon their own discretion. Under this authority Clark and Lee determined to bid up as high as $80,000, and there was probably some understanding between Clark and Hart that they would run it up to that figure. But this was intended to enhance the price, and not to suppress bidding, and how the complainant was injured or affected by the by-bidding of Hart, which only enhanced the value and encouraged competition, is not satisfactorily made out. It certainly falls short of that kind of mala fides which will affect a trustee's sale. "It is only some practice to prevent bidding or procure a sale for less than the property would have otherwise brought, which can be relied on by them to avoid the sale." Richards v. Holmes, 18 How. 143, 148, 15 L. Ed. 304.

5. It is next said that the property was bid in by Lee and Clark as individuals at their own sale as trustees, etc. But this is a total misconception of the facts. Clark and Lee, as we have already seen, bid the property in for the holders of the bonds secured under the

mortgage. Upon receiving a deed they at once joined Clark and McInnes in conveying the property back to the Ironton Coal & Iron Company, and the latter again mortgaged the property to secure their own outstanding bonds, so that matters were again as they were before Clark and McInnes had released their lien and accepted the bonds of the complainant company in place thereof.

The seventh article of the mortgage expressly authorized the trustees to buy at the sale, and the holders of the bonds to fix the amount at which it should be the duty of the trustees to buy in the property, and that the trustees should "on any such purchase hold the property so purchased upon the trust for the equal benefit of the bondholders who had so required the trustees to buy in the property." The power of the parties to stipulate as to the terms of sale by a trustee under a mortgage is indisputable in the absence of statutory regulation. This right of contract includes the right to agree upon an interested party as trustee, and that the trustee shall have the right to buy at his own sale for the benefit of the cestui que trust. 2 Beech on Trusts & Trustees, § 649; Davy v. Durant, 1 De Gex & Jones, Chan. 535; Montague v. Dawes, 12 Allen, 397; Elliott v. Wood, 45 N. Y. 71, 79; Woonsocket Institution for Savings v. American Worsted Co., 13 R. I. 255; Hall v. Bliss, 118 Mass. 554, 19 Am. Rep. 476; Ellenbogen v. Griffey, 55 Ark. 268, 18 S. W. 126; Knox v. Armistead, 87 Ala. 511, 6 South. 311, 5 L. R. A. 297, 13 Am. St. Rep. 65. The learned counsel for appellants cite Farrer v. Farrer, L. R. 40 Ch. Div. 395, and Glidden v. National Bank, 53 Ohio St. 588, 42 N. E. 995, 43 L. R. A. 737, to sustain their contention. Neither case denies the validity of a power of purchase granted to the trustee.

6. The bill charges a general collusion between the trustees and the Ironton Coal & Iron Company and a conspiracy to deprive the complainants of their property, which is averred to be easily worth $500,000, by unfair practices. The complainants held possession of the property involved from December 17, 1895, to some time in July, 1897, when George N. Gray, as agent for the trustees under the mortgage, took possession in pursuance of the powers in that regard. The complainants had, while in possession, made expenditures in the way of repairs, etc., aggregating possibly $30,000, but they had not put either furnace in condition for operation, as they had bound themselves to do, and had apparently exhausted all their means. They had suffered taxes to go unpaid, and had not paid a single interest coupon, and seemed to be entirely unable to comply further with their engagements, and for some weeks before the trustees took possession the premises were apparently or practically abandoned, all repair work having ceased. Prior to this occupation by the trustees the evidence tends strongly to show that both the Ironton Coal & Iron Company and the mortgage trustees had been urgent that the Etna Company should get the furnace into operation, and had manifested in every way an earnest desire that complainants might be able to raise the money to comply with their engagements and succeed in their undertaking. We find no evidence of any disposition to throw obstacles in their way, or desire to have them fail in their

undertaking. Upon the other hand, the indications are that the Ironton Company believed that it had sold this property for a good price, and was anxious that the purchasers should be able to retain and pay for it. That the property sold in fact for its fair value at the time is clearly made out. The Ironton Company reacquired this property by deed from the trustees dated October 12, 1897, and resold it to Henry Marting for $90,000, by deed dated October 19, 1898. This last sale was the result of much negotiating, and was the best price which they could obtain with all the value added by reason of the expenditures made by complainants in repairs. The evidence plainly indicates that the property had always been a money-losing enterprise until the extraordinary advance in the price of iron which set in soon after this sale to Marting. The high value placed upon the property by some of complainants' witnesses is plainly the result of the temporary inflation of the price of iron and steel, which began in 1899 and lasted through the taking of the evidence in this case. We are entirely satisfied that the extraordinary profits shown to have been made during that period were wholly due to very exceptional circumstances, and that the property is not well situated for profitable operation under normal conditions. But, however this may be, we are entirely satisfied that the property was not sacrificed at the sale made by the trustees. That sale occurred September 25, 1897. This bill was not filed until July 8, 1902. This delay is most unaccountable, unless it be, as we have indicated, that the rise in the value of this property did not occur until long after complainants had closed their unfortunate adventure. The record is barren of evidence of unfair dealing, or even of a harsh exercise of the legal rights of the vendors of the property. For the purposes of the case we have assumed that the only defendant, the Marting Iron & Steel Company, stands in the shoes of the bondholders who bought in the property, for the reason that we have reached the conclusion that, even upon that footing the complainants have no right to set aside the trustees', sale under the circumstances, including their long delay in bringing this suit.

Many other objections to the granting of any relief under this bill have been urged, which we have had no occasion to consider in view of our conclusion upon the questions considered.

The decree dismissing the bill for want of equity is accordingly affirmed.